AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT<br>PREMISES CONTROLLED BY  TWITTER, INC. PURSUANT TO 18<br>U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§<br>1752(a)(1) & (2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G) | )<br>)<br>)<br>)<br>)<br>)    Case No. 21-sc-1192 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A incorporated herein and included as part of this Application for a Search Warrant.

located in the      Northern      District of      California      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of this Application for a Search Warrant.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1752(a)(1) and (2); 40 U.S.C. §§ 5104(e)(2)(D) and (G) | Unlawful entry on restricted buildings or grounds;<br>Violent entry or disorderly conduct |

The application is based on these facts:

See attached Affidavit in support of Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anna Rinner, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 4/9/2021 _____

_____
*Judge's signature*

City and state: Washington, DC

Honorable U.S. Magistrate Judge G. Michael Harvey
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT<br>PREMISES CONTROLLED BY  TWITTER, INC. PURSUANT TO 18<br>U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§<br>1752(a)(1) & (2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G) | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  21-sc-1192

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of this Search Warrant.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of this Search Warrant.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 23, 2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____4/9/2021_____          _____
                                                                                          *Judge's signature*

City and state:          _____Washington, DC_____          Honorable U.S. Magistrate Judge G. Michael Harvey
                                                                                          *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-sc-1192 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

---

**Certification**

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____            _____
                                                                          *Executing officer's signature*

                                                                         _____
                                                                                    *Printed name and title*

## ATTACHMENT A
## Property to Be Searched

This warrant applies to information which is associated with the **Twitter** account identified by the name "**@croy_wes**", which is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., a company that accepts service of legal process at 1355 Market Street, Suite 900, San Francisco, California 94103.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.     Information to be disclosed by Twitter, Inc. ("PROVIDER") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

a.   For the time period from November 3, 2020 to the Present: All identity and contact
information, including full name, e-mail address, physical address (including city,
state, and zip code), date of birth, gender, hometown, occupation, and other personal
identifiers;

b.   For the time period from November 3, 2020 to the Present: All IP logs and other
documents showing the IP address, date, and time of each login to the account;

c.   For the time period from November 3, 2020 to the Present: All data and information
associated with the profile page, including photographs, "bios," and profile
backgrounds and themes;

d.   For the time period from November 3, 2020 to the Present: All "Tweets" and Direct
Messages sent, received, "favorited," or retweeted by the account, and all photographs
or images included in those Tweets and Direct Messages;

e.   For the time period from November 3, 2020 to the Present: All information from the
"Connect" tab for the account, including all lists of Twitter users who have favorited

or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

f.  For the time period from November 3, 2020 to the Present: All photographs and images in the user gallery for the account;

g.  For the time period from November 3, 2020 to the Present: All location data associated with the account, including all information collected by the "Tweet With Location" service;

h.  For the time period from November 3, 2020 to the Present: All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

i.  For the time period from November 3, 2020 to the Present: All data and information that has been deleted by the user;

j.  For the time period from November 3, 2020 to the Present: A list of all of the people that the user follows on Twitter and all people who are following the user (*i.e.*, the user's "following" list and "followers" list);

k.  For the time period from November 3, 2020 to the Present: A list of all users that the account has "unfollowed" or blocked;

l.  For the time period from November 3, 2020 to the Present: All "lists" created by the account;

m.  For the time period from November 3, 2020 to the Present: All information on the "Who to Follow" list for the account;

n.  For the time period from November 3, 2020 to the Present: All privacy and account settings;

o.  For the time period from November 3, 2020 to the Present: All records of Twitter searches performed by the account, including all past searches saved by the account;

p.  For the time period from November 3, 2020 to the Present: All information about connections between the account and third-party websites and applications;

q.  For the time period from November 3, 2020 to the Present: All records pertaining to communications between Twitter and any person regarding the user or the user's Twitter account, including contacts with support services, and all records of actions taken, including suspensions of the account; and

r.  For the time period from account inception to the Present: Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name(s), physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, usernames, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies.

Within **14 days** of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

> Special Agent Anna Rinner
> Federal Bureau of Investigation

Denver Field Office
111 S Tejon Street
Suite 600
Colorado Springs, CO 80903
alrinner@fbi.gov

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## II.     Information to be seized by the government

All information described above in Section I that constitutes **fruits, contraband, evidence and instrumentalities** of violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning:

a. Any plan to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b. The unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c. Any awareness of the official proceeding that was to take place at Congress on January 6, 2021, *i.e.*, the certification process of the 2020 Presidential Election;

d. Any efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, *i.e.*, the certification process of the 2020 Presidential Election;

e. Any conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f. Any breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g. Any riot and/or civil disorder at the United States Capitol on January 6, 2021;

h. Evidence concerning efforts after the fact to conceal evidence of those offenses;

(f) Information that constitutes evidence concerning: (i) Account user's entry into the Capitol Building in Washington, D.C. on January 6, 2021; (ii) any loud, threatening, or abusive language and/or disorderly or disruptive conduct by the Account user while inside of the Capitol Building in Washington, D.C. on January 6, 2021; and (iii) any parade, demonstration, or picketing by the Account user while inside of the Capitol Building in Washington, D.C. on January 6, 2021.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 1752(a)(1) & (2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G)** | **SC No. 21-sc-1192** |

*Reference: USAO Ref. # 2021R00354; Subject Account:* **"@croy_wes"**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Anna Rinner, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with  one account with the identifier "**@croy_wes**" – which is stored at premises controlled by Twitter, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which accepts service at 1355 Market Street, Suite 900, San Francisco, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Denver Field Office.  I am a graduate of the FBI Academy at Quantico, Virginia and I have been an FBI Special Agent for over a year.  In that time, I have investigated several violations, to include counterterrorism.  I have received training and I have gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, advanced open-source research, and various other criminal laws and procedures.  Prior to my employment as an FBI agent, I served as a university professor specializing in biology.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G) have been committed by Glenn Wes Lee Croy.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "any district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more

fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## **PROBABLE CAUSE**

### *Background – The U.S. Capitol on January 6, 2021*

6.    The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.    The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.    On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020

Presidential Election, which took place on November 3, 2020 ("Certification").  The exterior plaza of the U.S. Capitol was closed to members of the public.

10.     A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

11.     The joint session began at approximately 1:00 p.m. in the House Chamber.

12.     At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.  Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.     As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside.  Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building

and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15.     At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



16.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time,

USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

17.   At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.   Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19.   At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

20.   At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door

to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.     A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "It's Only A Matter of Time Justice is Coming."



23.     During  the  time  when  the  subjects  were  inside  the  Capitol  building,  multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training

and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





24.     At around 2:48 p.m., D.C. Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

25.     At about 3:25 p.m., law enforcement officers cleared the Senate floor.

26.     Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

27.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

28.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

29.     Beginning around 9:00 p.m., the House resumed work on the Certification.

30.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

31.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

32.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

33.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

34.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



[1]     https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





2   https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021.

3   https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

*Facts Specific to This Application*

35.     Glenn Wes Lee Croy ("CROY") is 45-year-old resident of ████████
████ .  CROY entered the U.S. Capitol building in Washington, D.C. on January 6, 2021.  In a conversation conducted over Facebook Messenger, CROY and Witness 1 discussed the Capitol riots.  In the course of this Facebook Messenger conversation, CROY told Witness 1, "I was there," and sent Witness 1 a picture of himself and another individual inside the U.S. Capitol Building standing in front of an Abraham Lincoln bust statue.  This photograph is pasted below this paragraph.  Witness 1 provided this information to the FBI and identified CROY as "Wes Croy" in the below photograph as "the male on the right."

14



36.     The FBI has confirmed with the U.S. Capitol Police that the statue CROY is

standing by appears to be located inside the U.S. Capitol Building.  It is titled "Lincoln the

Legislator" and rests, according to the Architect of the Capitol's website, in or near the Small House Rotunda in the south wing of the Capitol.

37.     CROY's Facebook profile display name is "Wes Croy".   Open source research identified the user ID of CROY's Facebook account as 100000907014713.   CROY's Facebook profile picture is a picture of a bronze statue of Baphomet.   In the Facebook message screenshots provided by Witness 1, the profile picture is the same Baphomet statue with the profile name "Wes Croy."   Additionally, the FBI viewed a Colorado driver's license photograph of CROY that was taken in 2019.   The individual in the official driver's license photo appears to be the same individual who is standing on the right in the photograph taken in front of the Abraham Lincoln statue.

38.     The individual on the left of the above photograph has been identified by law enforcement, including by both name (Terry Lynn Lindsey ("Lindsey")) and Facebook profile. CROY was Facebook Friends with Lindsey's Facebook profile prior to the apparent deletion of CROY's account as described below.

39.     In addition to the above-described Facebook Messenger conversation and shared photograph, CROY also sent Witness 1 videos from inside and outside the Capitol Building.   The inside videos show at least one other individual dressing up a statue with a hat and glasses, with other statues already dressed up, and the crowd of people inside the Capitol.   The outside video is filmed from the scaffoldings and show protestors below.

40.     As part of the investigation, the FBI obtained body camera footage from the Metropolitan Police Department that appears to show CROY inside the Capitol Rotunda.   The footage shows CROY inside the Capitol building.   Screenshots from the footage are pasted below this paragraph, with CROY indicated by a red marking.





41.    In the picture above, what appears to be a smartphone is visible in CROY's sweatshirt pocket.

42.    Witness 1 advised that CROY also had a Twitter account by the name "Croy Wes" and/or "LSD".  Open source research identified an account in the name of "**@croy_wes**".  On December 27, 2020, "**LSD @croy_wes**" made a reply tweet to Colorado Congresswoman Lauren Boebert.  Here, Boebert Tweeted, "Who is going to be in DC on January 6[th] to stand with President Donald Trump?" to which "**LSD @croy_wes**" replied, "fellow Coloradan we will be there."  It appears that both the Twitter account "**@croy_wes**" and Facebook account "Wes Croy" have since been deleted.

43.    Lawfully-obtained Google records show that ▓▓▓▓▓▓▓▓▓▓ is associated with the following basic subscriber information: name of Glenn Croy, Google Account ID of 163150000000, recovery SMS number of ▓▓▓▓▓ and Account Create Date of

18

09/07/2016.  Open source records indicate that CROY is associated with phone number ███████ ██ .

44.     According to records obtained through a search warrant which was served on Google, a mobile device associated with ██████████████ was present at the U.S. Capitol on January 6, 2021.  Google estimates device location using sources including GPS data and information about nearby Wi-Fi access points and Bluetooth beacons.  This location data varies in its accuracy, depending on the source(s) of the data.  As a result, Google assigns a "maps display radius" for each location data point.  Thus, where Google estimates that its location data is accurate to within 10 meters, Google assigns a "maps display radius" of 10 meters to the location data point.  Finally, Google reports that its "maps display radius" reflects the actual location of the covered device approximately 68% of the time.

45.     On February 17, 2021, CROY was arrested pursuant to an arrest warrant issued on February 16, 2021, by United States Magistrate Judge G. Michael Harvey in the United States District Court for the District of Columbia.  On February 17, 2021, CROY appeared at the Colorado Springs Police Department where he was taken to an interview room, arrested, and read his Advice of Rights.  CROY declined to be interviewed until he had an attorney present.  A Samsung S10e cellular telephone, IMEI 352808101694180, was seized from CROY in a search incident to arrest. The Samsung S10e is a smartphone with a camera and is capable of taking pictures and video.  It is also capable of accessing the Internet and social media accounts such as Twitter.  The cellular telephone seized from CROY had a black cover.  The color and size of the seized telephone is consistent with the photo above of CROY in the Capitol with what appears to be a cellular telephone in his pocket.  Shortly after his arrest, CROY was transported to the United States Marshals in Denver, Colorado.  While traveling from Colorado Springs to Denver, CROY

made unsolicited utterances to include the following: that "we" were at the Trump rally; that it was his first visit to Washington, D.C.; that "we" just walked in the Capitol doors like everyone else; that he did not break anything or hit anyone; that he just took a selfie; and that he was unaware that he was not supposed to be in the Capitol until later on, after he was inside.

46.     On January 10, 2021, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to account with the identifier "**@croy_wes**".

## **BACKGROUND CONCERNING PROVIDER'S ACCOUNTS**

47.     PROVIDER is the provider of the Twitter account(s) identified by "**@croy_wes**".

48.     PROVIDER owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com.  Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information.  Twitter also permits users create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve.  These features are described in more detail below.

49.     Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account.  The Twitter user may also change this username, password, and name without having to open a new Twitter account.

50.     Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter.  This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers.  For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account

was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

51.    A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

52.    Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

53.    As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

54.    Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

55.    Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off

by default, so Twitter users must opt in to the service.  In addition, Twitter users may delete their past location data.

56.     When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co.  This link service measures how many times a link has been clicked.

57.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates.  Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list).  Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting).  A Twitter user can also group other Twitter users into "lists" that display on the user's home page on Twitter.  Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

58.     In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers.  These messages are typically visible only to the sender and the recipient.  As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

59.     Twitter users can configure the settings for their Twitter accounts in numerous ways.  For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

60.     Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things.  A Twitter user may save up to 25 past searches.

61.     Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

62.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

63.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints.  Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.[4]

64.     As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a

_____

[4] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a criminal plan) or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

65.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and

experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

66.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users,

cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

67.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

68.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

69.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney

Christine Macey, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

70.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Anna Rinner
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 9, 2021

_____
HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF
## EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____     _____
Date                               Signature